McNATT *v.* HYMAN.

On Suggestion of Error

In Banc. Dec. 31, 1948.

(38 So. (2d) 107)

826

The original and dissenting opinions (36 So. (2d) 161) are as follows:

### Alexander, J.

Bill was filed by McNatt to quiet his title to all the minerals in, on or under a described tract. Answer and cross-bill were filed by the appellee, Hyman, who asserted ownership by a tax title. Later Hyman filed an original bill to confirm his title thereto. By agreement both causes were tried together. Final decree went to Hyman and appellant's bill was dismissed.

Appellee's title rests upon a deed from Sam Hyman dated May 21, 1946. This grantor had acquired title through two delinquent tax sales of the lands in 1943 and 1944 respectively, both being made to the said Sam Hyman. The assessment under which such sales were made was substantially as follows: "NW¼ SW¼ and all N½ lying W of Clear Creek. S 13, T 19, R 7," in Washington County. Appellant had record title to all the minerals therein.

In February 1942 McNatt requested the tax assessor to assess his minerals separately from the lands. The assessor refused so to do. Whereupon McNatt applied to the Chancery Clerk, who in turn directed him to the sheriff. The sheriff "assessed" the minerals at one dollar an acre, accepted a commensurate amount as "taxes" from appellant and issued a receipt therefor. This was done for the years 1943 to 1945, inclusive. A

notation was made by the sheriff upon the assessment roll showing the number of the receipt followed by the letters ''M R,'' which it is claimed, indicate mineral rights.

It is seen, therefore, that the narrow point for decisions is whether there was a valid separate assessment of the minerals. The proper method for such separate assessment is provided by Code 1942, sec. 9770. It is true that appellant sought to follow that method but the assessor refused to allow it.

It is not difficult to find materials for a judgment sympathetic toward appellant who made futile effort to isolate his mineral interest from the surface estate and thereby protect it against loss by a tax sale of the entire interest, such as was suffered by the appellant in Stern v. Parker, 200 Miss. 27, 25 So. (2d) 787, 790. Such, however, must be the fate of appellant's claim here, unless it was ''separately assessed.''

The basis for the alleged separate assessment of the minerals is that they had been ''left unassessed'' by the assessor. Code 1942, sec. 9901. There should be no doubt that the entire estate had been assessed by the assessor. Any inquiry into the reasons for refusal by the assessor separately to assess the minerals overlooks the controlling fact that he did not do so, and results merely in a personal criticism of that official.

In Stern v. Parker, supra, we said: ''The land cannot be said not to have been taxed 'in any way.' The land was assessed on the tax rolls by governmental subdivisions at a valuation, approved by the board of supervisors, after notice to those interested to appear and object. These appellants never did appear and object or do their duty to the taxing powers, themselves, their government or fellow citizens. The land was assessed in its entirety, and that means all of its assessable estates, by this unit assessment. This, they could and should have had corrected then, but did not.''

It is true that appellant here did undertake to effect a separate assessment. But his efforts fell short of available compulsory process by which he may have attained this end. We see no reason to charge the appellee, who, for all the record shows, is a bona fide purchaser from one who had acquired a tax deed to the entire estate, with the acts of omission of either the appellant or the assessor. Section 9770 concludes as follows: "And the value of said interest or interests shall be determined and fixed in the same manner and by the same officials now required by law to value and assess property for taxation." As further stated in the Stern case: "The fact that the tax assessor did not assess the sub-surface estate of appellants is not available to them to defeat the claims of appellee here. It was their primary duty to protect themselves, . . ."

The minerals were here not such as had been unassessed. Gully v. J. J. Newman Lbr. Co., 178 Miss. 312, 172 So. 740, 741; Stern v. Parker, supra. The original assessment of the land by the assessor was not void. His subsequent conduct could not make it so. His refusal to comply with Section 9770 may subject him but not appellee's title to criticism. The sheriff was without authority to make informal "assessment" of the minerals as land or interests that had been "left unassessed." This leaves appellant in the situation presented in Stern v. Parker, and the same result must follow.

Affirmed.

DISSENTING OPINION.

**Griffith, C. J.**, (dissenting).

The statute, Section 9770, Code 1942, makes it mandatory upon the assessor to separately assess the separate estate of oil, gas and minerals when the owner thereof returns the said separate ownership to him in due time with full information in that respect, as was done by the

owner in this case. The assessor's refusal to so assess was in violation of the positive mandate of the statute— his refusal was unlawful, with the result that what he did in pursuance of that refusal was unlawful. In short, his assessment of this estate as a part of the surface was unlawful and as a necessary consequent invalid, for an action cannot be unlawful and at the same time lawful or valid.

And this is exactly what we find when we turn to the books. In 51 Am. Jur., Taxation, Section 652, the true rule is stated as follows: "While the statutes of most states provide in considerable detail how the work of assessing the taxes shall be performed, compliance with all these provisions in exact conformity to the law is not necessarily a condition precedent to a valid tax. The test is whether the provision is for the benefit and protection of the individual taxpayer or is merely for the orderly administration of public affairs. All those provisions which are intended for his security, for insuring an equality of taxation, and to enable one to know with reasonable certainty for what real and personal estate he is taxed and for what all those who are liable with him are taxed, are conditions precedent which must be observed; otherwise the assessment will be void." The rule is elaborated upon to the same effect in 3 Cooley, Taxation, Sec. 1061; and see also 61 C. J. p. 621. So are all the authorities and it is believed that, except for the majority opinion in this case, there is none to the contrary.

The majority opinion says that although the assessment by the assessor was contrary to the positive mandate of the statute, the assessment so made was valid because it appeared to be so. In other words, that the assessor could violate the law and yet his violation has no invalidating effect. This rewrites the statute so as to make it directory rather than mandatory, contrary to its express language. In so doing refuge is taken in Stern v. Parker, 200 Miss. 27, 25 So. (2d) 787. But in that

case the owners of the mineral interest took no steps whatever or at any time to have it separately assessed, in respect to which we there said of the owners that "it was their primary duty to protect themselves," and that we should so adjudicate as to "require in the future observance of the statutes involved, requiring certain performance of mandatory duties and obligations from owners of various estates in lands." In short, because the owner took no steps in that case to put the statute, Section 9770, into operation, he could not complain that somebody else did not do it for him.

Here we have the exact opposite of that case. Here the owned did take the steps and did perform the primary duty necessary to bring Section 9770 into full operation in his behalf, wherefore the Stern case has no legitimate force against him whatsoever. The assessment of the mineral interest along with the surface being, under the facts of this case, void ab initio, it remained void, and therefore presented no obstacle to the assessment made by the sheriff on which the owner paid his taxes; thus putting him in a position whereby he is invested with all the equities and his suit should be entertained.

It is noticed also that the majority opinion invokes the doctrine of bona fide purchaser in support of its opinion. A purchaser at tax sale takes caveat emptor and likewise all who hold under him. Sufficient of this is disclosed in 31 Am. Jur., Taxation, Sec. 1061. If that doctrine could be successfully invoked in cases of invalid tax sales where the taxing officers have failed, neglected or refused to obey mandatory laws, then hundreds of cases in our books where such titles were cancelled as against vendees of the tax purchaser have been erroneously decided.

**L. A. Smith, Sr., J.,** joins in this dissent.

**Green & Green,** for appellant

**L. A. Wyatt,** also for appellant.

832

Wynn, Hafter, Lake & Tindall, for appellee,

**Roberds, J.**

On a former day we affirmed, by a divided court, the decree of the lower court entered in this cause. The suggestion of error has required a re-examination and reconsideration of the facts and legal questions. Since we have concluded the suggestion of error is well taken it is necessary for us to restate the case and give the reasons which have brought us to the present conclusion.

The precise question for decision is whether, or not, title to the minerals under approximately 136 acres of land located in Washington County was conveyed to Sam Hyman by a tax deed executed by the Chancery Clerk to Hyman April 8, 1946. There had been two tax sales to Hyman—one dated April 3, 1944, and the other dated April 2, 1945, but the tax deed is based alone on the 1944 sale. The time for redemption had expired under the 1943, but not under the 1944, sale. Under both sales the land was advertised as the ''NW¼ SW¼ and all N½ lying W of Clear Creek, S 13, T 19, R 7''. The consideration in the tax deed was $111.97. The value of tax purposes was $885.00 in 1943 and $800.00 in 1944. On May 21, 1946, Sam Hyman executed a quitclaim deed to the land to A. M. Hyman, the appellee.

It will be noted both tax sales purported to convey the surface and the minerals—the entire property. But McNatt contends the minerals were not conveyed under the facts of this case. We will state the essential facts, in addition to the foregoing, disclosed by the record.

On January 10, 1942, L. A. Wyatt was the fee owner of all the land—surface and minerals. On that day he executed a warranty deed to McNatt to ''all of the oil, gas and other minerals of every kind and character on

or under" the described land. The McNatt deed was recorded.

In February 1942, McNatt went to the tax assessor of Washington County and requested the assessor to separately assess to him the minerals. This report was oral and written. He informed the assessor he owned the minerals and he wanted them separately assessed "so I could pay taxes on it, and in case anything happened that the land tax was not paid I would be protected—have my minerals". He had a correct description and estimated a value for tax purposes at one dollar per acre, which was what he gave for it, and which value, it appears, was the uniform value for tax purposes on minerals in Washington County. The assessor refused to separately assess the minerals and declined to accept the writing, giving as a reason, according to the recollection of McNatt and not denied by the assessor, "the Board of Supervisors wouldn't assess the minerals separate from the land."

McNatt then went to the Chancery Clerk and inquired what to do. The Clerk told him to see the Sheriff and Tax Collector. He did that, advising the collector he owned the minerals and wanted them separately assessed. It appears the collector undertook to do that by making a notation on the roll on the line where the land was listed for taxes. Just what the collector did at that time is not entirely clear. Of course, the taxes for 1942 could not be paid in February, 1942, which was the time McNatt went to the assessor, the clerk and the collector. Presumably, the collector entered on that line the letters "M. R." in red pencil, which the deputy collector testifie was understood to mean mineral rights. The roll before us for the year 1942 shows, in addition to the number of the tax receipt issued to the owner of the surface, two other numbers with the letters "M. R." opposite them. These are in the column headed "Number of Tax Receipt 1942". In addition, there appears to the left of that column an unexplained number in a column without

a heading. As stated, it is not shown clearly what, if anything, other than "M. R." the Collector placed in that column when McNatt went to him in February, 1942. However, it is shown, without dispute, that McNatt paid to the collector the taxes on the minerals for the years 1942, 1943, 1944 and 1945, and the collector duly issued his tax receipts therefor. The receipts for the years 1942 and 1943 contain the wording "All mineral interest in the following Des. Property" describing the property according to the foregoing surface description, and also saying further "Des. DB 308 P. 485", which is the deed book and page, according to uncontradicted allegations of McNatt's bill, where his mineral deed appeared of record. The tax receipts for the years 1944 and 1945 recite for taxes on "Mineral Interest in following described Property", followed by the surface description. These receipts were entered by the Collector on his roll in proper columns under the respective years, the notation of the receipts being followed by the letters, in red ink, "M. R." In any event, the notations on the Collector's roll for the years 1942 and 1943, and copies of the tax receipts for those years were on file in his office, when the tax sale of April 3, 1944, was made, and those notations, as well as the notations made for the year 1944, were on the roll, and the copy of the tax receipts for payment on the minerals for 1944, as well as the previous tax receipts, were on file in the Collector's office, when the 1945 tax sale was made. It is thus seen that when both sales were made the taxes on the minerals for the years for which the sales were made, as well as the previous year of 1942, had been paid, and the tax records and receipts disclosed such payments and the deed records disclosed the separate ownership of the minerals in McNatt. Slight inquiry or investigation by the tax purchaser would have disclosed those facts.

The roll in the hands of the Collector is his authority to make sales and conveyances of lands for nonpayment of taxes thereon. Sections 9805 and 9921, Code 1942.

Yet, in this case, the roll itself, when these sales were made, showed not only the assessment made by the collector but the actual payment of the tax on the minerals to the collector himself. Section 9901, Code 1942.

██ █ The tax collector "shall assess and collect taxes on land liable to taxation left unassessed by the assessor . . . ." Section 9901, Code 1942. The manner of making the assessment is not prescribed by the statute. The collector undertook to assess these minerals. He had the authority to do so and the method adopted does not render his act invalid. But it is said no proof is made that the supervisors adopted a minute approving the collector's assessment. Section 9796, Code 1942, provides "Assessments must be approved by an order of the board of supervisors entered on the minutes; but the failure to make and enter such order shall not vitiate the assessment if it shall appear that the assessment was made according to law". There is no definite proof that the supervisors did, or did not, enter an order approving the assessment, but appellant offered to prove that the method here adopted was the usual method for such assessments in Washington County. The lower court sustained objection to that evidence. Therefore, apparently the supervisors did not enter an order approving the assessment and the method here used was the general method adopted in that County as to the assessment of minerals. Section 9901, Code 1942, not only confers authority upon and makes it the duty of the collector to assess and collect taxes on property unassessed by the assessor, but it also makes it the duty of the collector to ". . . report to the board of supervisors on making each monthly settlement, under oath, additional assessments made by him, a copy of which the clerk shall transmit to the Auditor within ten days, and he shall charge the amount of the State tax thereon to the collector . . ." ██ █ Therefore, we have the situation of the collector making an assessment of land left unassessed by the assessor, which the collector

had the authority to do, and we may properly presume he did his duty and reported each month to the supervisors the additional assessments. The taxes collected on such assessments were paid into the respective county and state treasuries. That had been done in this case two years before the first and three years before the second tax sale involved herein. Under these circumstances we think the supervisors had approved the mineral assessments under the facts of this case.

We have set out above, and now again call attention to, the efforts of McNatt to have the minerals assessed to himself separately from the surface. It is argued that even so he should have gone before the supervisors and insisted that the board enter an order approving the assessment made by the collector. This record discloses that his appearance before the board for that purpose would have been a vain and useless thing. In the first place, it is apparent from the record the method here used was the general method adopted throughout Washington County in assessing minerals. The assessor testified that several hundred came to him and wanted to pay on minerals. He refused to assess any of them. It is undisputed the supervisors would not assess the minerals separately. Therefore, as stated, had McNatt appeared before the Board of Supervisors and insisted that the minerals be separately assessed the request would have been vain and useless. In the second place, we do not think that McNatt, after doing what he did in this case, with the information before him, and after the assessment had been made by the assessor, was required to institute mandamus proceedings against the supervisors in an effort to compel them to enter an order approving the assessment as made by the collector. That would would be placing upon the taxpayer too great a burden. It is the duty of the taxing officials to assess property for taxes. McNatt did all that was required of him. This Court held in Brannan v. Lyon, 86 Miss. 401, 38 So. 609, that where a taxpayer tendered the amount of the tax

owing on his property and the collector erroneously stated to him the taxes had been paid, a sale of the property for non-payment of taxes was void. We have also held that where the clerk of the board of supervisors stated to the owner there had been no tax sale of the property, whereas, in fact, there had been a sale, the offer of the owner to redeem from the sale although he did not actually tender the money, deprived the clerk of the power to convey to the tax purchaser a title to the property. The opinion states ''The law does not require one to do a vain and useless thing''. McLain v. Mcletio et al., 166 Miss. 1, 147 So. 878, 879. Again, where the owner assumed his property had sold for taxes, and offered to pay the clerk the redemption money, but the clerk erroneously told the owner the taxes had been paid 'and no taxes were owing and due, this deprived the clerk of the power to subsequently convey to the tax purchaser a title to the property although the assessment was regular and valid. Kelly v. Coker, 197 Miss. 131, 19 So. (2d) 519; Beauchamp v. McLauchlin, 200 Miss. 83, 25 So. (2d) 771. The case at bar, in our opinion, is stronger for the taxpayer than the foregoing cases, for the reasons (1) the tax roll in the hands of the collector showed the separate assessment, and (2) that roll, as well as the copies of the tax receipts, disclosed the fact that the taxes on the minerals for two years before the first sale had actually been paid.

■■ Now, a tax purchaser is not an innocent purchaser for value. He takes the title subject to all its infirmities. Roebuck v. Bailey, 176 Miss. 234, 166 So. 358; 51 Am. Jur., Taxation, Sec. 1061. In Perret v. Borries, 78 Miss. 934, 30 So. 59, the owner paid his taxes but the collector misdescribed the property and it sold for taxes. The assessment roll and the advertisement showed the taxes had not been paid, and the assessment and non-payment appeared perfectly regular, yet this Court held the tax purchaser got no title. Suppose, in this case, the minerals had sold to the State. Surely the Court

would have held, under the state of this record and the all-important fact that the county and state had been paid the tax, that the State would not have gotten title to the property. The tax purchaser is in no better position than the State would have been.

We, therefore, hold under the combination of circumstances existing in this case that appellee Hyman, as against appellant, got no title to the minerals. His title to the surface is not involved. McNatt's bill should have been sustained, and the bill of Hyman should have been dismissed.

Suggestion of error sustained, the cause is reversed and judgment here for appellant.

**McGehee, J.,** dissents.

DISSENTING OPINION.

**Alexander, J.** (dissenting).

Despite the conclusions of the majority of the Court whose opinion and personnel have changed since the rendition of the original opinion I find myself unconvinced that our former view were at variance with the law. Much stress has been put upon the good intentions and the continued efforts of the appellant to have his minerals properly assessed. If they were not so assessed, the unsuccessful efforts of the appellant should create only a measure of sympathy but not of duty. With deference, I must confess that I find the majority opinion an effort to save the appellant by the invocation of unique presumptions and certain assumptions which are found necessary to support them. Although the Court has stated, "we think the supervisors had approved the mineral assessments under the facts of this case", it is clear that this is not a conclusion based upon the record but an assumption which impliedly concedes the necessity for such approval. Appellant never made application to the Board itself. The inference that such application would

have been vain is no doubt logical argument, but the fact remains that appellant did not make such application, and the attitude of the Board is inferred solely from mere hearsay statements of the assessor.

I am of the opinion that the purchaser at the tax sale purchased that which had been assessed which was the entire interest in the land. Stern v. Parker, 200 Miss. 27, 25 So. (2d) 787, 27 So. (2d) 402. It had therefore not escaped taxation and had not been "left unassessed". The man in the street would perhaps come to the assistance of the appellant and find comfort in any solution regardless of its foundation, which would reward appellant for efforts which the law should find to be abortive, but we are not men in the street, we must stand upon the law as it is written. The action of the sheriff and tax collector was well meant, but not well founded. He was without authority to assess these minerals as property which had escaped taxation or assessment and his effort so to do has not been authenticated by any showing of a report thereof to the Board of Supervisors. The assessor acted without authority in refusing the demand of appellant. The tax collector acted equally without authority in his informal amendment of his roll.